**Johnnie Mae ROBINSON, Appellant,**

v.

**WASHINGTON INTERNAL MEDICINE ASSOCIATES, P.C., et al.,
Appellees.**

**No. 92–CV–1461.**

District of Columbia Court of Appeals.

Argued Nov. 10, 1993.
Decided Sept. 19, 1994.

---

Dominique D. Michel, with whom William E. Artz, Arlington, VA, was on the brief, for appellant.

Alfred F. Belcuore, Washington, DC, with whom Stephen L. Altman and Vicki J. Hunt, Fairfax, VA, were on the brief, for appellees.

Before FARRELL and KING, Associate Judges, and MACK, Senior Judge.

WARREN R. KING, Associate Judge:

In this medical malpractice action, trial court plaintiff Johnnie Mae Robinson ("Robinson"), daughter and administratrix of the estate of Lela Jones ("Jones"), seeks reversal of a judgment in favor of appellees Washington Internal Medicine Associates, P.C. and Dr. Merril Stock (collectively "Dr. Stock"). Robinson contends the trial judge erred in instructing the jury on contributory negligence, maintaining there was insufficient evidence to support that defense. Further, Robinson contends the trial judge, in giving the instruction, erred in not also instructing that the only acts of the decedent which could be considered contributorily negligent were those acts contemporaneous to the alleged negligent acts attributed to Dr. Stock.

Among his other arguments in support of the judgment, Dr. Stock contends that appellant was obligated to request a special verdict in order to preserve the issues presented in this appeal. In short, Dr. Stock contends that because no special verdict was sought, Robinson cannot demonstrate that the verdict rested on the assertedly erroneous contributory negligence instructions. For the reasons stated in Part II.A. and Part III. of

this opinion, and in the concurring opinion of Judge Farrell, we hold that there is no basis for reversal in this case.

## I.

Robinson brought survival and wrongful death actions, alleging negligent follow-up care by Dr. Stock, after he performed a lower endoscopic examination of the colon of 82–year–old Lela Jones. On the morning of January 24, 1991, Dr. Stock performed the endoscopy to determine whether Mrs. Jones was suffering from gastrointestinal bleeding. Shortly after recovering from the procedure, some two hours later, Jones was given written instructions by Dr. Stock to "promptly" report to him any "unusual bleeding, vomiting, pain, fever or other reactions" to the examination. In addition, Dr. Stock told Jones that she would probably experience some gas discomfort. Dr. Stock instructed Jones to call him the following morning to report how she was feeling. Thereafter, Jones was discharged and she returned home.

Later that day, Jones telephoned Robinson, her daughter, complaining that she was not feeling well. In response, Robinson directed Jones's great-granddaughter, who was approximately 23 years old at the time, to attend to Jones until Robinson could do so herself later in the day. When the great-granddaughter arrived, Jones told her that she was suffering from abdominal cramps. Thereafter, Robinson and Jones's grand-daughter arrived, finding that Jones was still experiencing stomach cramps, which persisted throughout the evening and night. At no time that day or evening, or during the night, or early morning hours of the next day, did Jones, or anyone on her behalf, inform Dr. Stock, or any other medical personnel, of Jones's condition.

At approximately 9:00 a.m. the following morning, Robinson telephoned Dr. Stock as he had directed. Dr. Stock testified that Robinson reported only that Jones was experiencing gas discomfort and he recommended that decedent take some over-the-counter remedies to provide relief. On the other hand, Robinson testified that she informed Dr. Stock that her mother had been experiencing abdominal pain and had been "spitting up."

At approximately 3:00 p.m., Robinson again called Dr. Stock and informed him that Jones had a fever, had been vomiting and experiencing severe abdominal cramps, and had not urinated that day. Dr. Stock directed that Jones be immediately taken to an emergency room. Robinson then began to assist Jones in getting dressed, during the course of which Jones experienced a heart attack; she was pronounced dead at approximately 5:00 p.m. The cause of death was later determined to have been acute peritonitis as a result of a perforation of Jones's large bowel that occurred during the endoscopy.

At trial, Robinson's expert witnesses conceded that the perforation itself was not the result of negligent treatment, but was a known risk of the examination. The only negligence attributed to Dr. Stock was his asserted failure to properly respond during the course of the 9:00 a.m. telephone call. In his defense, Dr. Stock contended that Jones herself was negligent in not following the post-endoscopy instructions. Specifically, he argued that Jones failed to inform him of the severity of her symptoms. Dr. Stock's expert also testified that even if the decedent has been immediately treated as a result of the 9:00 a.m. conversation, she could not have been saved. On the other hand, Robinson's experts testified that at that stage Jones's condition was reversible with corrective surgery.

Over appellant's objection, the trial judge instructed the jury on contributory negligence. Robinson contended that such an instruction was improper because there was no evidence that Jones, as opposed to Robinson who placed the call, had been negligent during the course of the 9:00 a.m. telephone call. Further, Robinson, although preserving her objection to the giving of the contributory negligence instruction, requested that the trial judge instruct the jury that the only conduct that could be considered as being contributorily negligent was the asserted failure to inform Dr. Stock, during the 9:00 a.m. telephone call, of the true nature of Jones's

condition—not any antecedent failure of Jones to follow instructions. The trial judge denied that request but advised that Robinson was free to make the point during closing argument.[1]

During deliberations, the jury sent two separate notes to the court, the second of which stated: "[s]ome of our concern is equal negligence by majority vote. Where do we go from here?" In response, the trial judge reinstructed the jury on the theories of negligence, contributory negligence, and causation, directing the jury to resume deliberation. Soon thereafter, the jury returned a general verdict in favor of Dr. Stock. This appeal followed.

## II.

This appeal raises a question that has never been expressly decided by this court: whether a plaintiff who failed to request a special verdict (or a general verdict accompanied by interrogatories) in a negligence action, where the defense denies negligence and also asserts the affirmative defense of contributory negligence, is estopped from challenging an adverse verdict on the ground that there was error in the giving of the affirmative defense instruction. In resolving that question, we look for guidance in our cases considering analogous issues.

## A.

█ In *District of Columbia v. White,* 442 A.2d 159, 164–66 (D.C.1982), we reversed a judgment entered after a plaintiff's verdict in a negligence action where the jury was instructed on alternative theories of liability, and one of the theories was held by the court to be based on insufficient evidence. We reasoned that it was impossible to determine whether the verdict was based on a permissible or impermissible theory because the jury did not specify which theory or theories formed the basis for its verdict. *Id.* at 165. We concluded under those circumstances there was a possibility that the jury may have relied on the impermissible theory in

reaching its verdict. *Id.* at 165–66 (citations omitted); *see also District of Columbia v. Jackson,* 451 A.2d 867, 873–75 (D.C.1982) (remanding for new trial on damages).

Nine years later, this court narrowed the *White* rule in *Nimetz v. Cappadona,* 596 A.2d 603 (D.C.1991). In *Nimetz,* as in *White,* there were several possible theories of negligence that the jury considered, at least one of which was hotly contested on sufficiency of evidence grounds. *Id.* 596 A.2d at 605–06. To guard against the problem presented in *White,* plaintiff requested that the jury be given a special verdict form that would require it to specify which theory or theories formed the basis for any verdict reached. *Id.,* 596 A.2d at 604. The defendant objected, the trial judge denied the request, and the jury thereafter returned a general verdict in favor of the plaintiff. *Id.*

On appeal, defendant conceded that there was sufficient evidence to support the verdict with respect to five of the six theories of liability; however, we held that the trial court erred in its instructions with respect to the sixth theory. *Id.* at 605–06. Under *White,* that determination would seemingly have called for a reversal of the judgment. Declining to reverse, however, we "adopt[ed] the rule that a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury." *Id.* at 608. The court reasoned that "[f]rom the perspective of the most efficient use of the judicial system, it would clearly have been preferable for [defendant's] counsel to have acquiesced in (and the trial judge to have granted even over objection) [plaintiff's] counsel's request for a special verdict form.... Our courts are overburdened, and a plaintiff should not have to endure a second trial when the rules of procedure provide a remedy.... *[T]he litigants* bear the responsibility to request or submit special verdict forms." *Id.* at 607–08 (emphasis added; citations and internal quo-

---

1. The opportunity was not accepted since no such argument was made by counsel for Robin- son.

tation omitted). Also holding that the rule announced would apply to that case, we affirmed the judgment that had been entered in favor of the plaintiff. *Id.* at 608–10.

*White* and *Nimetz* involved multiple theories of liability with general verdicts in cases where it was determined that at least one of the theories could not be sustained. This case, however, involves a single theory of liability with two separate defenses: either there was no negligence (or no proximate causation) or, if there was negligence, the plaintiff was contributorily negligent. Because the jury returned a general verdict in favor of the defendants, we do not know whether the jury found that the defendants were not negligent (or that proximate causation was not proven) or that the plaintiff was contributorily negligent. The identical circumstances were present in *Sinai v. Polinger Co.*, 498 A.2d 520, 523 (D.C.1985), where the plaintiffs contended that the trial judge erred, *inter alia*, by instructing the jury on affirmative defenses of assumption of risk and contributory negligence. In *Sinai*, we observed that because a general verdict was returned, "we do not know whether [the jury] even reached the question of contributory negligence or assumption of risk." *Id.* at 523 n. 1. Nevertheless, the court reached the merits but warned that:

> [w]e do not rule out the possibility, in future cases, of requiring that a plaintiff make some showing of special prejudice before he [or she] will be permitted to challenge the verdict based on issues the jury may well never have reached, where the plaintiff, as in this case, failed to request that special interrogatories be submitted to the jury.

*Id.*

Judge Nebeker, concurring separately, declined to reach the merits, urging that the court adopt the rule that a plaintiff who wishes to challenge an adverse verdict because of asserted defects with respect to an affirmative defense must demonstrate, either through a special verdict form or interrogatories, that the verdict rested on that defense. *Id.* at 533–34 (Nebeker, J., concurring in result). He reasoned that because a general verdict was returned, appellants could not

establish prejudice requiring a new trial: "The general verdict shrouded the decision of the jury in darkness. Appellants might have dissipated that darkness by asking pursuant to Super.Ct.Civ.R. 49(b), for a general verdict accompanied by the jury's answers to interrogatories." *Id.* at 533 (Nebeker, J., concurring in result) (citation, internal quotation, and alteration omitted). Further, he noted that such a requirement is necessary "where, as here, there was a genuine question regarding primary negligence, [because] it is entirely possible that the jury never even reached the issues presented by the instructions." *Id.* Finally, remarking that every appellant bears the burden of persuading the court that the trial judge committed error, Judge Nebeker observed that had interrogatories been requested by trial counsel, "we would know specifically what the jury found and whether they even considered the defenses asserted by appellees." *Id.* (citation omitted).

■ As foreshadowed by *Sinai*, we now hold that a plaintiff who objects to the giving of affirmative defense instructions, but who does not request either a special verdict or a general verdict with interrogatories, is estopped from raising any claim of error with respect to the affirmative defense on appeal. In so holding, we reiterate that it is well established that a party challenging an adverse judgment bears the heavy burden of persuading this court that the trial judge committed error. *Cobb v. Standard Drug Co.*, 453 A.2d 110, 111–12 (D.C.1982); *see also Sinai, supra,* 498 A.2d at 533 (Nebeker, J., concurring in result) (citation omitted); D.C.Code § 11–721(e) (1989). An appellant satisfies that burden by presenting the court with a record sufficiently demonstrating entitlement to the relief sought. *See Cobb, supra,* 453 A.2d at 111–12. Requiring a special verdict in these circumstances is entirely reasonable "where, as here, there was a genuine question regarding primary negligence, [because] it is entirely possible that the jury never even reached the issues presented by the instructions. Instead, the jury may simply have found that the defendants were not negligent." *Sinai, supra,* 498 A.2d at 533 (Nebeker, J., concurring in result). Further,

"[w]hile it is true that the trial court might have rejected counsel's proposed queries, appellants would have been able to preserve an objection to the failure to direct answer[s] to specific questions." *Id.* (citation omitted). Thus, a plaintiff who challenges an affirmative defense instruction, but fails to take steps to preserve the point raised before the trial court, cannot demonstrate prejudice attributable to the assertedly erroneous instruction.

■ We are satisfied that *White* does not compel a contrary result, and we are persuaded that the holding in that case should be limited to its facts.[2] *White* is very much a minority rule,[3] and most state courts follow the so-called general verdict rule, which provides that if a jury renders a general verdict, and no party requests a special verdict or interrogatories, the appellate court will affirm the judgment based on that verdict if substantial evidence supports any one of the other theories upon which the jury was instructed.[4] In sum, we extend the estoppel rule we announced in *Nimetz* to the circumstances presented here and, therefore, hold that a plaintiff who fails to request either a special verdict or a general verdict with interrogatories, in a negligence action where the defense both denies negligence (or, relatedly, proximate causation) and asserts an affirmative defense, is estopped from contending on appeal that the jury may have relied on an impermissible affirmative defense theory if the evidence supports an alternative rejection of primary negligence by the jury.

**B.**

■ Ordinarily we would next determine, as we did in *Nimetz*, whether to apply the new estoppel rule to the litigants actually before the court. As noted in his concurring opinion, however, Judge Farrell would not reach that issue, but would affirm on other grounds. For the reasons stated below, I am of the view that the estoppel rule we have announced in Part II.A. should apply in this case.

In *Nimetz*, we held that, although retroactive application was not automatic, the estoppel rule announced should apply in that case, based on the factors set forth by the Su-

**2.** As we stated in *Nimetz, supra,* 596 A.2d at 608, "[i]n [*White*], the court was not presented with a question involving the effect of failing to request a special verdict...."

**3.** For state court cases applying a rule similar to the one announced in *White, see, e.g., Alabama Farm Bureau Mut. Casualty Ins. Co. v. Smith,* 406 So.2d 913, 916 (Ala.Civ.App.1981); *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 461–62 (Alaska 1986); *Oban v. Bossard,* 201 Neb. 243, 267 N.W.2d 507, 510 (1978); and *Circus Circus Hotels, Inc. v. Witherspoon,* 99 Nev. 56, 61–63, 657 P.2d 101, 105–06 (1983). *See also* 89 C.J.S. *Trial* § 505, 177 (1955) ("it is more commonly held that, in the absence of a request for an instruction that the jury bring in a separate verdict on each count, or motion for a directed verdict on each count, where several counts, issues, or theories are tried and submitted to the jury, the general verdict will stand if the evidence on one count, issue, or theory is sufficient to sustain the verdict").

**4.** *See, e.g., Continental Dairy Equip. Co. v. Lawrence,* 17 Cal.App.3d 378, 94 Cal.Rptr. 887, 890 (1971) (where jury returned general verdict against plaintiff on his complaint and in favor of defendant on its cross-complaint, general verdict rule applies because substantial evidence supports the verdict, and judgment must be sustained); *Giardini v. Supermarkets Gen. Corp.,* 24 Conn.App. 9, 585 A.2d 110, 111–12 (1991) (where jury was instructed on defenses of no negligence and contributory negligence, plaintiff not entitled to challenge instruction with respect to defendant's negligence); *E.F. Hutton v. Sussman,* 504 So.2d 1372, 1373 (Fla.Dist.Ct.App. 1987) (where jury awarded punitive damages and defendant failed to request special findings as to whether defendant acted recklessly, willfully, or wantonly, award would be sustained); *Goad v. Evans,* 191 Ill.App.3d 283, 138 Ill.Dec. 523, 529, 547 N.E.2d 690, 696–97 (1989) (where jury returned general verdict in favor of plaintiff in wrongful death action, defendant not entitled to contest negligent entrustment instruction since he failed to request special interrogatories and jury was instructed on multiple theories of liability); *Radtke v. Yokose,* 87 A.D.2d 220, 453 N.Y.S.2d 43, 44–45 (1982) (where jury returned general verdict in favor of defendant and neither party requested special verdict or interrogatories, trial judge did not err in refusing to inquire of jury degree of negligence attributable to each party); and *Teague v. United Truck Serv.,* 499 P.2d 380, 383–84 (Okla.1972) (where jury returned general verdict in favor of defendants, judgment would be affirmed because there was evidence from which jury could conclude plaintiff was contributorily negligent or that defendants' negligence was not probable cause of injury).

preme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). The continued vitality of *Chevron Oil* has been placed in doubt, however, by two recent decisions of the Supreme Court. Specifically, in *James B. Beam Distillery Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), and more recently in *Harper v. Virginia Dep't of Taxation,* —— U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), the Court held that, where it had applied a new rule of federal law in a civil case, the new rule "must be given full retroactive effect in all cases still open on direct review." *Harper, supra,* —— U.S. at ——, 113 S.Ct. at 2517. In both *James B. Beam* and *Harper,* however, the Court was implementing federal law and neither case purports to apply to the circumstances presented here. It is not necessary to decide, however, whether the automatic retroactivity rule of *James B. Beam* and *Harper* or the more flexible principles set forth in *Chevron Oil* should govern because, as pointed out below, application of the *Chevron Oil* factors nonetheless compels the conclusion that the estoppel rule announced today should apply to the litigants in this case.

In *Nimetz,* the court resolved the question of the applicability of a new rule there announced to the litigants in the case before it by applying the factors set forth in *Chevron Oil, supra. Chevron Oil,* however, dealt with the retroactivity of a new rule, which had been announced in a completely different case, to cases that were pending when the new rule was announced.[5] In short, *Nimetz* dealt with same-case retroactivity, while *Chevron Oil* dealt with the retroactivity of another case previously decided, *i.e.,* other-case retroactivity. Analysis under *Chevron Oil* requires an examination of the previous

rule, the reliance upon that rule by litigants, and the potential hardship, if any, that would result from retroactive application of the new rule. *See Chevron Oil, supra,* 404 U.S. at 106–07, 92 S.Ct. at 355–56.

More closely on point on same-case retroactivity is this court's decision in *Mendes v. Johnson,* 389 A.2d 781 (D.C.1978) (en banc), where we analyzed the factors to be considered in determining whether to apply a new rule of law to the litigants in the case in which the new rule was announced. Most of the *Mendes* factors are essentially the same as those applicable in other-case retroactivity analysis, *i.e.,* considerations relating to the significance of the litigant's reliance on the old rule. The court recognized, however, that there is a distinction between same-case retroactivity and other-case retroactivity when the majority held that the new rule announced in *Mendes* would apply in that case, but it would not otherwise operate retroactively.[6] *See id.* at 789 (same-case retroactivity, but other-case non-retroactivity). In reaching that result, the court acknowledged that rewarding a party who seeks to change the law, by applying the new rule to that party, a consideration not included within the *Chevron Oil* analysis, is a significant factor in determining same-case retroactivity.[7] *See id.* at 791. Giving similar weight to that factor in this case provides further support for the conclusion below, applying the *Chevron Oil* factors, that the new rule should be applied in this case.

In *Nimetz,* in deciding whether to impose a rule retroactively, we looked to factors set forth in *Chevron Oil:*

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or

5. In *Chevron Oil,* a Gulf of Mexico oil rig employee (Huson) brought an action in the federal district court for damages caused by an injury suffered by him on the rig. *Chevron Oil, supra,* 404 U.S. at 98, 92 S.Ct. at 351. While that case was pending, the Supreme Court decided *Rodrigue v. Aetna Casualty & Sur. Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), which held, with respect to a statute of limitations claim, that Rodrigue's claim was time barred. If that ruling retroactively applied to Huson's claim against Chevron Oil, that claim would also be time barred. The Supreme Court held, however, ap-

plying the factors discussed *infra,* that the *Rodrigue* rule would not apply retroactively. *See Chevron Oil, supra,* 404 U.S. at 105–09, 92 S.Ct. at 354–56.

6. Six judges supported that result, while four judges would have applied the new rule only to future cases.

7. Research has revealed no civil case decided by this court that did not apply a new principle of law to the litigants in the case deciding the issue.

by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we have weighed the inequity imposed by retroactive application, for [w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice and hardship by a holding of nonretroactivity.

*Nimetz, supra,* 596 A.2d at 608 (citing *Chevron Oil, supra,* 404 U.S. at 106–07, 92 S.Ct. at 355) (alterations in original) (quotations omitted).

In *Nimetz* we held that the estoppel rule announced there did not overrule past precedent, *id.,* and I conclude we should reach the same result with respect to the rule we announce today which does no more than extend the *Nimetz* estoppel rule to those cases where a defendant has denied the validity of the claim and has also raised an affirmative defense.[8] Further, in *Nimetz* we relied in part on the fact that the estoppel rule announced had been forecast by previous decisions of the court. *Id.* at 608–09 (discussing *District of Columbia v. Bethel,* 567 A.2d 1331, 1334 (D.C.1990); *Sinai, supra,* 498 A.2d at 523 n. 1; and *Jackson, supra,* 451 A.2d at 873–74). The same is true with the rule set forth above, which was clearly foreshadowed in *Sinai:*

We do not rule out the possibility, in future cases, of requiring that a plaintiff make some showing of special prejudice before he [or she] will be permitted to challenge the verdict based on issues the jury may well never have reached, where the plaintiff, as in this case, failed to request that special interrogatories be submitted to the jury.

*Sinai, supra,* 498 A.2d at 523 n. 1. Moreover, the holding in *Nimetz*—which itself preceded the trial in this case by almost exactly a year—also made clear that the rule set forth in *White* would be narrowly construed. *Nimetz, supra,* 596 A.2d at 608–09.[9] Indeed, counsel for Robinson acknowledged at oral argument that if, in resolving the jury note issue discussed *infra,* the court concluded that it could not be certain that the jury rested its verdict on a finding of contributory negligence, then the judgment must be affirmed.

Additionally, retroactive application of this rule will further its operation. Since *White* was decided in 1982, we have commented on at least four separate occasions about the advisability of a party requesting a special verdict in order to preserve its point when appealing an adverse verdict. *See, e.g., Nimetz,* 596 A.2d at 608 (holding that defendant who objects to a request for a special verdict may not later avail him or herself of the rule of *White* on appeal); *Bethel, supra,* 567 A.2d at 1334 (observing that it was an open question whether a defendant who fails to request a special verdict or interrogatories is estopped from challenging jury verdict); *Sinai, supra,* 498 A.2d at 523 n. 1 (observing, without deciding, that a plaintiff who failed to request a special verdict may be required to make a showing of special prejudice in order to challenge verdict); *Jackson, supra,* 451 A.2d at 873 (observing that defendant should have met its burden by requesting a special verdict or special findings). I agree with

8. In *Mendes, supra,* where we applied the new rule to the litigants before the court, we reached that decision even though we were also expressly overruling binding precedent. Thus, the level of reliance on prior law by the *Mendes* litigants was at its highest. Here, as noted above, the effect of the reliance factor is just the opposite since there was ample forewarning of the rule we announce today. If the new rule announced in *Mendes* applied to the litigants before the court where the reliance factor weighed so heavily against retroactivity, it would follow that the same would be the case where, as here, the reliance factor

clearly points in the direction of applicability of the new rule to the litigants before the court.

9. As Judge Farrell noted in *Nimetz,* "[h]enceforth *White* will apply only where the parties have urged a special verdict instruction but the trial judge, for reasons of his [or her] own, refuses to give it. I have difficulty imagining that ever happening, but the prospect is so slight in any event that I think we have today repudiated *White.* Indeed, many of the decisions the court cites in support of the estoppel rule we adopt explicitly reject the rule of *White.*" *Id.,* 442 A.2d at 610 (Farrell, J., concurring).

Judge Farrell's observation in his concurring opinion in *Nimetz:* "*White*'s demise, for all practical purposes, was forecast—hence putting prudent attorneys on notice not to oppose a special verdict in these circumstances—by our decisions beginning with *District of Columbia v. Jackson*, 451 A.2d 867 (D.C.1982)." *Nimetz, supra,* 596 A.2d at 611 (Farrell, J., concurring). I am confident that retroactive application of the rule announced today will serve to further the application of the well-established principle set forth in *Cobb,* that appellants must demonstrate that they were harmed by an asserted trial court error by taking the necessary steps to preserve the issues they may wish to later raise on appeal. Thus, where, as here, a party failed to preserve an issue for appeal, he or she should not be "permitted to challenge the verdict based on issues the jury may well never have reached." *Sinai, supra,* 498 A.2d at 523 n. 1.

Finally, a balance of the equities favors the retroactive application of the rule announced today. As noted in *Nimetz,* "[a] party has it within his or her means—by requesting a special verdict—to insure that a finding of negligence rests upon a theory supported by the evidence, and absent such a request there is no unfairness in assuming that juries rest their conclusions on theories founded in the evidence." *Nimetz, supra,* 596 A.2d at 611 (Farrell, J., concurring). Indeed, failure to apply the *Nimetz* rule to plaintiffs as well as defendants would be an unprincipled distinction inconsistent with notions of equal justice. Plaintiff had every opportunity to request a special verdict, and Dr. Stock should not be subjected to a second trial simply because Robinson failed to adequately preserve the issue. Moreover, I cannot say that retroactive application of the rule would result in "injustice to a party because of reliance on the continued validity of the prior legal rule" when this court has clearly forecast its intention to limit that rule. *Mendes v. Johnson, supra,* 389 A.2d at 789. In sum, I would apply the special verdict rule announced today to the instant appeal.[10]

### III.

█ In support of her argument that she was prejudiced by the contributory negli-

---

10. Unlike my dissenting colleague, I am not convinced that this court's recent opinion in *Howard Univ. v. Baten,* 632 A.2d 389 (D.C.1993), requires a different result. In that case we held that the trial court erred, in a breach of an employment contract action, in instructing the jury that it could award damages to the employee for mental anguish in addition to ordinary monetary losses due to the termination. The employee argued that since there was no way of determining whether the verdict included any damages for mental anguish, the employer should be estopped from challenging the damages award because he did not request a special verdict which would have clarified what portion, if any, of the damages awarded was attributable to mental anguish. *Id.* at 393. We concluded that since the employee was as responsible as the employer for the absence of separate verdicts on the two elements of damages, it would be unfair to permit the employee to now benefit from the employer's failure to ensure there were separate verdicts, *i.e.,* under the circumstances the employee must share at least equal responsibility with the employer for the court's failure to secure separate verdicts. *Id.* at 394.

·The dissent reasons that since each party in this case was free to request a special verdict then, as in *Baten,* Dr. Stock must share equal responsibility with the patient's representative for the failure to secure a special verdict. That conclusion misapprehends what occurred in *Baten.*

In *Baten,* the trial judge made it unmistakably clear that she would not separate the two types of damages (one valid and, the other, as this court ultimately ruled, invalid). *Id.* Moreover, counsel for the employee, in further colloquy with the court, reinforced that view by adopting the position that the mental anguish damages component was so intertwined with the legitimate damage component that separating the two would not be feasible. *Id.* Thus, any request by the employer for a special verdict would have been met by staunch opposition by both opposing counsel and the court. It is little consequence that this court concluded, under those circumstances, that the employee shared at least equal responsibility for the failure to obtain separate verdicts. Indeed, that characterization likely understated the employee's role. Similarly, in *Nimetz,* where several grounds of negligence were propounded to the jury, we held that a defendant who actively opposed the plaintiff's request for a special verdict could not claim on appeal that an impermissible ground formed the basis for the jury's verdict.

In short, the litigants in both *Baten* and *Nimetz* were not permitted to avail themselves of the benefits that might ordinarily have been accorded them due to the absence of a special verdict, because they actively helped to bring about that result by some affirmative action of their own in the trial court.

That is not the case here. Appellant is obligated under *Cobb* to present to this court a record

gence instruction, Robinson asks this court to infer from the "equal negligence" note that the jury must have concluded that Jones was contributorily negligent when it found for the defendants. It is not this court's function to second-guess jury verdicts. *See Arnold v. United States,* 511 A.2d 399, 417 (D.C.1986) (trial judge did not abuse discretion in denying defendant's request for individual poll of each juror on each count of an indictment where trial judge received note from a juror the day before the jury returned its verdict stating that the juror did not agree with fellow jurors); *cf. Luck v. Baltimore & Ohio R.R. Co.,* 166 U.S.App.D.C. 283, 288, 510 F.2d 663, 668 (1974) (observing that jury misconduct must be proved by "legally competent evidence"). As Robinson conceded at argument, it is just as plausible that the jury—reinstructed on all three theories—found either that Dr. Stock complied with the applicable standard of care or that his conduct was not the proximate cause of death, as it is that the jury found Jones was contributorily negligent. Appellant, moreover, does not contend, nor could she, that sufficient evidence does not support such findings of no negligence on either basis noted.[11] We decline to speculate as to the significance of the jury note, which on its face is ambiguous, and we, consequently, conclude that the jury note casts no light on the question of whether the verdict rested on the claim of negligence or the affirmative defense.

*Affirmed.*

FARRELL, Associate Judge, concurring in part and concurring in the judgment.

I join all but part II.B. of Judge King's opinion. Specifically, I agree that the rule of *Nimetz v. Cappadona,* 596 A.2d 603 (D.C.

1991), that a tort defendant claiming trial error as to a particular theory of liability must—under pain of forfeiting the issue on appeal—present a record from which an appellate court can determine that the verdict depended on that theory, applies to plaintiffs and affirmative defenses as well. There is no sound reason for not enforcing the rule both ways. Our reliance on *Cobb v. Standard Drug Co.,* 453 A.2d 110 (D.C.1982), however, deserves an additional word. The *Nimetz* rule assumes here, for purposes of decision, that the trial court erred in submitting appellee's defense of contributory negligence to the jury at all or, at least, in instructing the jury about that defense. Ordinarily, when an appellant has succeeded in demonstrating trial error, it becomes the burden of the party defending the judgment to demonstrate that the error was harmless—that it did "not affect the substantial rights of the parties." D.C. Code § 11–721(e) (1989). The present situation differs, however, in that appellant concedes the possibility that the verdict rested on an entirely independent ground of non-liability; the most he can assert is the equal possibility that it rested on the error-tainted theory.[1] In this context, as most courts have held (see Judge King's discussion, *ante* at 1145), it is both logical and fair to impose on the party contesting the verdict the duty of having taken readily available measures in the trial court—a special verdict or its equivalent—to insure that a later decision by the appellate court will not be hypothetical.

Unlike Judge King, however, I do not believe that we should decide the issue of even partial retroactivity, *i.e.,* whether our exten-

demonstrating entitlement to the relief it seeks. *See Cobb, supra,* 453 A.2d at 111–12. That could have been accomplished by a request for a special verdict. Dr. Stock took no action whatsoever to prevent such inquiry and there is nothing in *Baten* that suggests, in the absence of some affirmative conduct on the part of the appellee which frustrated appellant's ability to obtain the information necessary for successful appellate review, that the appellant can avoid the consequence of its failure to make a proper record for this court's review.

11. Based upon our review of the record, we conclude that there was sufficient evidence be-

fore the jury to establish either that Dr. Stock was not negligent or that any negligence attributed to Dr. Stock was not the proximate cause of death.

1. Appellant contends that the jury's note indicates a greater than equal likelihood that it ruled on the basis of contributory negligence, but I agree with Judge King that we can draw no such conclusion from the note, which was followed by partial reinstruction on *both* negligence and contributory negligence.

sion of *Nimetz* applies to the case before us.[2] Judge Mack makes a persuasive argument why a litigant in appellant's shoes could have read *Nimetz* as announcing a narrower rule that a party may not *oppose* a special verdict requested by its adversary and yet seek reversal based on ambiguity in the general verdict—in other words, that the parties share *jointly* the responsibility to request a special verdict where necessary, a duty on which appellee defaulted here no less than appellant. Indeed, our subsequent decision in *Howard Univ. v. Baten*, 632 A.2d 389 (D.C.1993), lends support to this reading since in that case we refused to apply the *Nimetz* rule after concluding that the plaintiff, having himself acquiesced in a general verdict, "share[d] at least equal responsibility with [the defendant] for the [trial] court's failure to insure separate verdicts. . . ." *Id.* at 394. I agree with Judge King that the primary duty, under pain of estoppel, to attempt to clarify the basis of the verdict through special interrogatories lies with the party seeking to preserve a claim of error for appeal; future litigants can scarcely claim ignorance of that rule. But given the ambiguity of *Nimetz* and *Baten* on this point, I would be hesitant to apply the rule to the case before us.

Nor do I think it necessary to decide the retroactivity issue, because, unlike Judge Mack, I am convinced that the trial court committed no reversible error in regard to the contributory negligence defense. First, we cannot hold on this record that no reasonable juror could rationally find that Mrs. Jones was contributorily negligent. Even limiting the relevant conduct to her behavior concurrent (or "simultaneous") with Dr. Stock's asserted negligence in responding to her 9:00 a.m. telephone call (through her daughter), there was testimony the jury could have credited which established that Mrs. Jones had been cautioned in written post-operation instructions, read during the night by herself and her daughter, to report "any unusual bleeding, vomiting, pain, fever

or other reactions [to the colonoscopy] promptly to your doctor." There was further evidence (which, of course, plaintiff disputed) that Mrs. Jones informed Dr. Stock in the morning phone call only that she—in the present tense—"has gas," without relating to him any of the symptoms of spitting up and abdominal pains that she had suffered during the night.

Appellant is quite right that contributory negligence in this context must take into account "the disparity in medical knowledge between the patient and the doctor and . . . the patient's right to rely on the doctor's knowledge and skill in the course of medical treatment." *Martineau v. Nelson*, 311 Minn. 92, 247 N.W.2d 409, 415 (1976). Moreover, contributory negligence can be defeated by testimony that the physician failed to elicit necessary information by asking questions of a lay patient who, without such probing, has only limited capacity "to select and communicate to her examiners the pertinent . . . aspects of her medical history." *Favalora v. Aetna Casualty & Sur. Co.*, 144 So.2d 544, 550 (La.Ct.App.1962). But appellant makes no claim that the jury was not, or upon request could not have been, instructed in accordance with these principles. Moreover, contributory negligence remains a defense fully available in the medical malpractice context, requiring the defendant to prove "the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances." *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C.1985). That burden can be met by proving that the plaintiff failed to use ordinary care in relating to the physician, in non-technical language, her medical symptoms and condition. *See, e.g., James v. Krpan*, 116 Ariz. 216, 568 P.2d 1114, 1115 (1977); *Haynes v. Hoffman*, 164 Ga.App. 236, 296 S.E.2d 216, 217–18 (1982); *Mackey v. Greenview Hosp., Inc.*, 587 S.W.2d 249, 255 (Ky.Ct.App.1979); *Fall v. White*, 449 N.E.2d 628, 633 (Ind.Ct.App.1983). At least where a reasonably prudent person would know that the information she conveys, by its omission

---

**2.** As Judge King acknowledges, the Supreme Court's recent retroactivity decisions effectively overturning the analysis of *Chevron Oil v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which this court applied in *Nimetz*, are not binding on us; and this case presents no occasion for general reconsideration of this court's retroactivity law. *See, e.g., Mendes v. Johnson*, 389 A.2d 781 (D.C.1978) (en banc).

of important facts, could mislead the physician, a jury rationally can find that her negligence concurred with whatever fault attended the doctor's failure to ask questions in bringing about the resulting harm. *E.g., Mackey,* 587 S.W.2d at 255.

A contributory negligence instruction is appropriate when "the defense has borne its burden to put forth some evidence upon which a jury could find that the plaintiff, by encountering the risk created by the defendant's breach of duty, departed from an objective standard of reasonable care." *Sinai v. Polinger Co.,* 498 A.2d 520, 524 (D.C.1985). Under Dr. Stock's version of events, Mrs. Jones's failure *via* the 9:00 a.m. telephone call to communicate the severity of her symptoms the night before, contrary to instructions that she report any vomiting, fever or other reactions, presented a jury question as to whether her negligence "was a substantial factor in causing her injury," *id.* at 528, thus relieving the defendant of liability.

Appellant further contends that, at a minimum, the judge erred in not granting his request to instruct the jury that any negligence by the plaintiff before the 9:00 a.m. phone call could not be considered, under the principle that "[t]o constitute a bar to the [judgment,] the negligence of the patient ... must have been simultaneous and co-operating with the fault of the defendant." 61 AM.JUR.2D *Physicians, Surgeons, Etc.,* § 302 (1981). See also Brief for Appellee at 18 ("Defendants concede, as did their counsel at trial, that for the decedent's contributory negligence to constitute a bar to recovery, it must have been concurrent with the alleged negligence of Dr. Stock"). In my view there was no error to begin with because, although the central focus of both sides' presentations may have been the 9:00 a.m. phone call and Dr. Stock's and Mrs. Jones's respective omissions at that time, appellant nonetheless introduced evidence that would have allowed the jury to conclude that Dr. Stock's negligence was not limited to his response to that telephone call but was "continuing," having begun the day before in the immediate aftermath of the operation.

There was testimony that after the operation Mrs. Jones was taken to a recovery room and a file notation was made that she complained of "abdominal cramping and discomfort." Yet she was released from the hospital late that afternoon. Dr. Brownlee, one of plaintiff's experts, testified that the standard for post-operative treatment following a colonoscopy involves continuous monitoring of the patient's condition, particularly when she has complained of discomfort. He therefore refused to specify the time ("Time A, Time B, Time C") when Dr. Stock's breach of the standard of proper care took place: "if the patient is complaining and continues to complain and you do not evaluate her, you've breached." Dr. Stock's failure was thus ongoing, "continu[ing] even to the following morning," for "[o]nce [the patient] complains and you have nothing that says that you have satisfied the cause of that complaint, you *have now begun* [to breach the standard of care]" (emphasis added). Not surprisingly, although plaintiff's other expert did not believe there had been negligence by Dr. Stock before the 9:00 a.m. phone call, defendant's counsel in summation felt obliged to respond to the theory of continuing negligence advanced by Dr. Brownlee—a theory, counsel argued, that "was disagreed to by every gastroenterologist who testified in this courtroom." Absent a stipulation to strike Dr. Brownlee's testimony and the theory of "continuing" negligence, the trial judge did not err in refusing to instruct the jury to disregard Mrs. Jones's own inaction during the night (in failing to report her symptoms "promptly") that was concurrent with Dr. Stock's asserted continuing failure to exercise reasonable care.[3] *See Johnston v. Ward,* 288 S.C. 603, 344 S.E.2d 166 (1986).

---

**3.** Furthermore, even assuming that Mrs. Jones's inaction before 9:00 a.m. had no bearing on whether Dr. Stock deviated from the standard of care in responding to her call in the morning, it is not clear why her conduct during the night would not have been relevant to whether his negligence proximately caused her death—that is, to whether, as appellant's counsel stated in summation, "this woman was salvageable" in the morning. The close conceptual interrelatedness of proximate causation and contributory negligence, *see, e.g., Marlow v. Cerino,* 19 Md.App. 619, 313 A.2d 505, 509 (1974) (cited in *Stager,* 494 A.2d at 1312), is an additional reason why the trial judge properly rejected appellant's proposed instruction.

But even if the judge erred in failing to give the requested instruction, I would not reverse the judgment on the mere hypothetical possibility that the jury found contributory (as opposed to no primary) negligence to begin with and that, in doing so, it relied on evidence (of pre-9:00 a.m. behavior) which appellee's counsel himself never argued was relevant to that issue. In *Finkelstein v. District of Columbia*, 593 A.2d 591 (D.C. 1991) (en banc), this court pointed out that "courts routinely assess the impact of instructional formulations [or, as here, omissions] . . . on the jury in the context of a party's theory of the case as argued to the jury. . . ." *Id.* at 597–98. At issue in that case (involving the trial court's reversal of a jury damage award as excessive) was the trial court's determination as to "the critical [time] period the jury considered" in assessing the plaintiff's pain and suffering. In sustaining the court's determination, we relied importantly on the fact that plaintiff's counsel, in summation to the jury, had restricted his plea for damages to the time period identified by the trial court. *Id.* at 597; *see also id.* at 601 ("the judge saw that plaintiff himself then narrowed the issue of damages to this critical afternoon period in closing argument"). In the present case, Dr. Stock's counsel argued in summation that Mrs. Jones's contributory negligence lay in her failure to inform the doctor of her symptoms in the telephone call at 9:00 a.m.—that just as the daughter told him *later* that day that she had been vomiting and he immediately instructed her to take her mother to the hospital, so "he would have done the same thing at nine o'clock in the morning if [Mrs.] Jones had just given him a chance."[4] Counsel did not assert negligence based on Mrs. Jones's inaction during the night. Appellant's counsel, in turn, argued that "[t]he doctor charged with superior knowledge of her medical condition had the obligation to act on her complaints as of nine o'clock, and had he done that, everything that had gone before on the part of Mrs. Jones would have been of no moment." The parties' arguments, in short, joined issue on what complaints Mrs. Jones had conveyed to the physician at 9:00 a.m. and what steps he should have taken in response. We accordingly can say with fair assurance, *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530 (D.C.1991), that the absence of an instruction that any earlier failure on her part to telephone the doctor was irrelevant had no effect on the jury's verdict.

MACK, Senior Judge, dissenting:

As a general proposition, I might agree with Judge King that "a plaintiff who fails to request either a special verdict or a general verdict with interrogatories, in a negligence action where the defense both denies negligence (or, relatedly, proximate causation) and asserts an affirmative defense, is estopped from contending on appeal that the jury may have relied on an impermissible affirmative defense theory if the evidence supports an alternative rejection of primary negligence by the jury." *Ante* at 1145. If we are in the business of redefining issues (as the majority has done) I could just as easily agree with the general proposition that a defendant who, in a negligence action, bears equal responsibility with a plaintiff for requesting a special verdict, is estopped from contending on appeal that the plaintiff has waived the right to challenge a misleading instruction, unsupported by the evidence, and submitted to the jury over objection. Moreover, in the better role of valor, I would hope that this court would refrain from gratuitously announcing a new rule (however provocatively foreshadowed by prior judicial ruminations) and, at least for one of my colleagues, apply it retroactively, to the benefit of one party and the detriment of the other, where both parties bear equal responsibility for what gives every indication of being an obviously erroneous verdict.

Therefore, if we are to embrace the first general proposition of estoppel, I would apply this rule to future cases only. However, I am hesitant to adopt any rule which was not fully briefed or argued before this court. One day before oral argument in a letter to the court dated November 9, 1993, appellees first raised the estoppel issue addressed in

---

4. Later counsel again argued: "Why wouldn't Dr. Stock do at nine o'clock what he immediately did at three o'clock, and they never answered that question."

*Nimetz v. Cappadona,* 596 A.2d 603 (D.C. 1991). Neither appellant nor appellee has briefed the estoppel issue nor has this court heard informed argument regarding the merits of adopting such a sweeping rule that will have such a dramatic effect on the trial court and bar. Additionally, the individual circumstances of this case merit an evaluation of the contributory negligence instruction. Since the contributory negligence instruction was flawed and not supported by the record, I would reverse the judgment and remand for a new trial. I respectfully dissent.

## I.

In *Sinai v. Polinger Co.,* 498 A.2d 520, 523 n. 1 (D.C.1985), this court reviewed a challenge to the propriety of a contributory negligence instruction under circumstances where an injured tenant sought damages against a property owner. In upholding a verdict for the landlord, we reasoned that the evidence showed that the tenant's own negligence was a substantial factor in causing the injury. In a footnote we observed that, because a general verdict was returned, we did not know whether the jury even reached the question of contributory negligence and therefore we left open the issue of whether in future cases this court would require "that a plaintiff make some showing of special prejudice before he will be permitted to challenge the verdict based on issues the jury may well never have reached, where the plaintiff, as in this case, failed to request that special interrogatories be submitted to the jury." *Id.* at 523 n. 1; *see also District of Columbia v. Bethel,* 567 A.2d 1331, 1334 (D.C.1990) (observing that the court need not decide the estoppel issue). In *Sinai,* Judge Nebeker, concurring separately, declined to deal with the merits of the alleged error. Instead he urged the court to adopt the rule it finally adopts today: that a plaintiff who wishes to challenge a general verdict based on an alleged defect in an affirmative defense must demonstrate prejudice, and that the verdict rested on that defense, either through a special verdict or interrogatories. 498 A.2d at 533–34 (Nebeker, J., concurring in result).

Six years later in *Nimetz v. Cappadona, supra,* we considered factual circumstances where the plaintiff had asked for a special verdict on each of the six theories of liability. The defendant objected to the sixth theory of liability and to the request for a special verdict. The trial court decided to use a general verdict form. *Id.,* 596 A.2d at 606. On appeal by the defendant this court adopted

the rule that a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury.

*Id.* at 608.

It is apparent from *Sinai* and *Bethel,* that prior to *Nimetz,* this court had not adopted any form of an estoppel rule. Thus, it was not until the ruling in *Nimetz* that a party might remotely be considered on notice that it might be estopped from appealing an alleged erroneous instruction affecting liability when it had not requested a special verdict or interrogatories. However, the *Nimetz* decision, on its face, appears to be limited to defendants and in particular to defendants who object to a request for a special verdict. Thus, the notice that any plaintiff (let alone a plaintiff who did not object to a request for a special verdict) would be estopped from raising an erroneous instruction issue because of a general verdict, is attenuated. Therefore, I am hesitant to apply a new rule, or at least the first clear statement of an estoppel rule for a plaintiff, to this case.

Moreover, the instant case can readily be distinguished from the court's decision in *Nimetz.* Here neither the plaintiff—decedent's administratrix (Ms. Robinson)—nor Dr. Stock requested a special verdict.[1] The

---

1. In *Nimetz* the plaintiff requested a special verdict, but the defendant opposed the request. In *Nimetz* the defendant was attempting to double-dip by objecting to the sixth theory of liability and the special verdict. Since the jury's verdict was going to be based on a general verdict the defendant thought it could appeal a potential verdict for the plaintiff based on the erroneous inclusion of a theory of liability, while at the same time avoiding a special verdict which might reveal that a jury had found liability based on

equal blame of the plaintiff and defendant in not pursuing a special verdict was recently recognized by this court as a paramount distinguishing factor in *Howard Univ. v. Baten,* 632 A.2d 389, 393–94 (D.C.1993).

In *Baten,* the defendant objected to a damages instruction. The plaintiff requested a special verdict, but then withdrew the suggestion after an extensive conversation with the trial judge. The defendant never objected to the request for a special verdict since the plaintiff withdrew the request, nor did the defendant request a special verdict on its own. On appeal, the plaintiff argued that "Howard waived the issue of the erroneous damage instruction under this court's decision in *Nimetz v. Cappadona,* 596 A.2d 603 (D.C.1991)." *Baten, supra,* 632 A.2d at 393. This court determined "that it would be unfair to apply the waiver rule of *Nimetz* on these facts." *Id.* at 632 A.2d 394. The court stated that "in this case—unlike in *Nimetz—* we are not convinced that the defendant bore primary responsibility for the fact that the case was submitted to the jury without a special verdict form on damages." *Id.* The court stated that the plaintiff shared at least equal responsibility with the defendant for the court's failure to have a special verdict and therefore reversed and remanded the case for a new trial based on the erroneous instruction.

This case has many similarities with *Baten.* Both parties in this case share the responsibility for failing to ask for a special verdict. Neither party asked for a special verdict. In fact, unlike in *Baten,* neither the plaintiff nor the defendant initially requested a special verdict only to withdraw its request later. This case is also unlike *Nimetz,* where one party requested the special verdict and the other party objected to the special verdict. In *Nimetz,* the defendant tried to rely "on appeal on the very uncertainty he helped foster." 596 A.2d at 606. As noted, here, neither party requested nor objected to a special verdict. Since both parties share the responsibility for failing to insure a special verdict, this court should, as it did in *Baten,* determine that it would be unfair to apply the estoppel rule to one party.

one of the five valid theories of liability in the

## II.

Today one of my colleagues would bar the appellant from challenging any aspect of the contributory negligence instruction. This forecloses an almost sacred right of appeal to a plaintiff who should not be forced to bear alone the brunt of a jury's confusion in the complex arena of medical malpractice. Even a cursory examination of the instruction reveals that it may have been misleading in failing to explain the legal time strictures attendant to the concept of contributory negligence and to give guidance on the applicable standard of care. There is moreover a serious question as to whether the jury's verdict is supported by the evidence. It is important to all parties in this most specialized and sensitive area of litigation that this court examine any impact that the instruction might have had on the jury.

As Judge King states:

The only negligence attributed to Dr. Stock was his asserted failure to properly respond during the course of the 9:00 a.m. telephone call. In his defense, Dr. Stock contended that Jones herself [the decedent] was negligent in not following the post-endoscopy instructions. Specifically, he argued that Jones failed to inform him of the severity of her symptoms.

*Ante* at 1142.

At trial, the plaintiff (the administratrix and daughter of Mrs. Jones) objected to the contributory negligence instruction arguing that the daughter, who placed the call, could not be negligent. According to Judge King, the plaintiff also unsuccessfully requested that the jury be instructed "that the only conduct that could be considered as being contributorily negligent was the asserted failure to inform Dr. Stock, during the 9:00 a.m. telephone call, of the true nature of Jones's condition."

At the outset we examine certain general principles. This court stated in *Sinai* (not a medical malpractice case):

In evaluating the propriety of a contributory negligence instruction, the trial court

case.

must focus upon the objective reasonableness of the plaintiff's conduct, and must determine whether the defendant has presented evidence that the plaintiff's behavior in *encountering the risk departed from the standard of care that is to be expected of the reasonable person in the plaintiff's position.* The plaintiff's departure from the normal standard of conduct (his "fault") deprives him of the right to assert that the defendant was also at fault. A contributory negligence instruction is appropriate only if the defense has borne the burden to put forth some evidence upon which a jury could find that the plaintiff, by encountering the risk created by the defendant's breach of duty, departed from an objective standard of reasonable care.

498 A.2d at 524.

Moving to the case law involving medical malpractice, "[c]ontributory negligence is the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances." *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C.1985). This court has stated that "a patient has a duty to cooperate with her doctor in proper diagnosis and treatment." *Id.* at 1312. However, "in the context of medical malpractice, the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense." *Morrison v. MacNamara*, 407 A.2d 555, 567 (D.C. 1979).

We must evaluate the propriety of the contributory negligence jury instruction given here in light of the nature and time of the claimed negligence as well as any departure from the relevant standard of care, along with the sufficiency of the evidence. Each one of these areas may reveal prejudicial trial error requiring a new trial.

**2.** There was some evidence that Dr. Stock was negligent in his post-operative treatment from the time the appellant complained of "abdominal cramping and discomfort" following the operation until her death. However, this theory was abandoned at trial and on appeal both parties agree that the only negligence claimed was dur-

**A.**

Plaintiff does not allege negligence prior to the 9:00 a.m. telephone call between the patient's daughter and Dr. Stock.[2] Therefore, decedent's behavior prior to the 9:00 a.m. telephone call is irrelevant to the contributory negligence inquiry.

[M]any courts have held that the defense of contributory negligence in a medical malpractice action is inapplicable when a patient's conduct provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care, or treatment on which a subsequent medical malpractice claim is based.

*Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178, 184–85 (1990).

As another court noted:

conduct prior to an injury or death is not legally sufficient in an action for damages like this, unless it is a legal or proximate cause of the injury or death—as opposed to a cause of the remote conditions or occasion for the later negligence. So it is with conduct of a patient which may have contributed to his illness or medical condition, which furnishes the occasion for medical treatment. That conduct simply is not available as a defense to malpractice which causes a distinct subsequent injury—here, the ultimate injury, wrongful death.

*Matthews v. Williford*, 318 So.2d 480, 483 (Fla.Dist.Ct.App.1975); *see also Whitehead v. Linnkous*, 404 So.2d 377, 379 (Fla.Dist.Ct. App.1981) ("A remote condition or conduct which furnishes only the occasion for someone else's supervening negligence is not a proximate cause of the result of the subsequent negligence."). "[A] physician may not raise the defense of contributory negligence where the plaintiff's negligence occurred prior or to the alleged act of malpractice." *Cheek*

ing the 9:00 a.m. telephone call. To the extent Judge Farrell relies upon Dr. Brownlee's testimony regarding ongoing negligence by Dr. Stock beginning after the operation, I would assert that Mrs. Jones's alleged contributory negligence would be relevant as a mitigating factor and not as a bar to recovery.

*v. Domingo,* 628 F.Supp. 149, 151 (D. Virgin Islands 1986); *see also Overstreet v. Nickelsen,* 170 Ga.App. 539, 317 S.E.2d 583, 585 (1984) ("The cause of the injury for which [plaintiff] sought treatment has absolutely no relevancy to whether she somehow contributed to any of the subsequent injuries sustained as the result of [defendant's] allegedly negligent treatment, diagnosis or abandonment of her.").

As I have noted, decedent's actions prior to the 9:00 a.m. phone call are irrelevant to the negligence action or the defense of contributory negligence. The alleged malpractice occurred during that phone call. Moreover, a patient's subsequent aggravation to an injury is not contributory negligence, rather it acts to mitigate damages. *See Cheek, supra,* 628 F.Supp. at 151 (failure to obtain follow up treatment resulting in infection and amputation serves only to mitigate damages and is not contributory negligence); *Santoni v. Schaerf,* 48 Md.App. 498, 428 A.2d 94, 99 (1981) (patient conduct after the negligence which adds to the effects mitigates the damages), *rev'd on other grounds sub nom. Moodie v. Santoni,* 292 Md. 582, 441 A.2d 323 (1982); *Bird v. Pritchard,* 33 Ohio App.2d 31, 62 O.O.2d 96, 291 N.E.2d 769, 771 (1973) ("Where the fault of the patient was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician, it only affects the amount of the damages recoverable by the patient.").

Here the trial court's jury instruction was as follows:

As to the plaintiff's decedent, Lela Jones only, and this is a little different from what I said at the opening part of the trial, but now that we have all the evidence in, the claim—there is a claim of contributory negligence, but it applies to Lela Jones, not to the plaintiff who is sitting before you here in court. Just as to her.

A plaintiff cannot recover if her negligence is a proximate cause of her injury. The defendant has the burden of proving that the plaintiff's negligence was a cause

of the plaintiff's injury. That's contributory negligence which you need to consider if you get that far.

This jury instruction allowed the jury to consider conduct before and after 9:00 a.m. The conduct prior to the alleged negligence cannot constitute contributory negligence and the conduct after 9:00 a.m. can only be considered by the jury for mitigating damages. Since the jury instruction did not adequately confine the jury's considerations to only the defendant's action during the 9:00 a.m. call, and instead allowed the jury to consider the descendant's actions prior to and after the alleged negligence, it was misleading and contrary to malpractice contributory negligence law.[3] Therefore, the jury instruction was misleading and merits reversal for a new trial.

**B.**

In this situation the absence of guidance as to the patient's standard of care is likewise a critical issue. "[A] patient does not have a duty to diagnose his own condition as he can reasonably expect the physician to ask the proper questions." *Fall v. White,* 449 N.E.2d 628, 634 (Ind.Ct.App.1983). However, "[t]he patient is contributorily negligent if a reasonably prudent person would know that the history was false and misleading." *Mackey v. Greenview Hosp., Inc.,* 587 S.W.2d 249, 255 (Ky.Ct.App.1979).

Thus, an instruction for contributory negligence should state "that a patient has a duty to exercise *reasonable care* in providing medical information" and the standard of conduct is "that of a reasonably prudent person under like or similar circumstances." *Fall, supra,* 449 N.E.2d at 634; *cf. Stager, supra,* 494 A.2d at 1311 ("Contributory negligence is the failure to act with the prudence demanded of an ordinary person under like circumstances."). In *Sinai,* this court, not in a medical malpractice case, upheld a valid con-

**3.** Unlike Judge Farrell, I believe an instruction limiting the jury's use of Mrs. Jones's conduct during the night solely for deliberation on the issue of proximate cause could be carefully con-

structed. Appellant disputes the expansive nature of the contributory negligence instruction not the relevance of Mrs. Jones's conduct prior to 9:00 a.m. towards proximate cause.

tributory negligence instruction.[4] The instruction stated in part:

Did he do or fail to do something which a person using ordinary care would do or not do. Remember that ordinary care means that care, caution and attention which a reasonable person would exercise under similar circumstances. Bear in mind that the similar circumstances are those which confronted the doctor on December 2nd. If you find that he was confronted with an emergency situation, he is not held to the same conduct as one who had an opportunity to reflect on his situation.

*Sinai, supra,* 498 A.2d at 523–24 n. 2.

The jury instruction in the instant case is measurably short of the adequate contributory negligence instruction in *Sinai.* Not only was the instruction not confined to the 9:00 a.m. phone call, but it failed to provide any standards for evaluating contributory negligence. Here, the instruction only stated that "A Plaintiff cannot recover if her negligence is a proximate cause of her injury." There was no mention of what a reasonably prudent patient might do under like circumstances nor was there any information regarding the relationship between the physician and patient regarding the duty to provide information for diagnosis. This failure to include any duty or standard of care, which is necessary for the jury's adequate consideration of the issue of contributory negligence, was erroneous and merits reversal for a new trial.

## C.

Focusing on the relevant time in question, I examine the sufficiency of the evidence in light of case law. A patient's contributory negligence "must be concurrent with that of the physician." *Santoni, supra,* 48 Md.App. 498, 428 A.2d at 99.

To constitute a bar to a suit for malpractice, the contributory negligence of the patient must have been an active and efficient contributing cause of the injury made the basis of the patient's claim; it must

have been simultaneous and co-operating with the alleged fault of the defendant, must have entered into the creation of the cause of action and must have been an element in the transaction which constituted it.

*Sendejar v. Alice Physicians & Surgeons Hosp., Inc.,* 555 S.W.2d 879, 885 (Tex.Ct.App. 1977).

As another court has stated:

Consequently, to be considered as and constitute contributory negligence in a medical malpractice action, a patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based.

*Jensen, supra,* 459 N.W.2d at 186–87. In the instant case the decedent never spoke with the physician at 9:00 a.m. Initially, one wonders how a patient who did not speak to a doctor at the relevant time could be contributory negligent in failing to give information for a complete diagnosis. This fact alone makes it hard to suggest that the decedent could be contributorily negligent. In fact, the failure to ask to speak to the patient following surgery might constitute negligence. Especially, in this case, where the decedent was an elderly woman who had complained of pains following surgery. However, assuming that the daughter was acting on the decedent's behalf, in the role of a guardian, it is unclear how what was conveyed over the telephone could constitute contributory negligence. The perforation itself was not the subject of negligence;[5] the only negligence asserted was that involving the 9:00 a.m. telephone call. Therefore, the daughter's statement over the phone is the only potential conduct that the doctor could claim as contributory negligence.

---

4. The plaintiff in *Sinai,* confronted an obviously crazed individual who cursed and slapped him, followed his assailant to a parking lot and unsuccessfully sought to subdue him.

5. The plaintiff's expert witness conceded this fact on the grounds that this was a known risk of the examination, a factor which would appear to place more of an onus on the doctor in providing follow-up care.

"Whether a physician is negligent in making a diagnosis must be determined in light of the existing circumstances including the facts then known to him, rather than on the basis of facts which are revealed by later developments." *Mackey, supra,* 587 S.W.2d at 254. "The failure of a physician to receive a full and accurate history from the patient may provide a basis for finding that the physician was not guilty of malpractice." *Id.* A patient is

> under no general duty to diagnose her own condition or to volunteer information. She could reasonably expect that the physicians and nurses would ask the proper questions. Unless the physicians or nurses exercised ordinary care in obtaining the history, the patient's failure to communicate a particular aspect of his medical history ordinarily will not constitute contributory negligence.

*Id.* at 255; *see also Fall, supra,* 449 N.E.2d at 633. Yet,

> [t]he patient is contributorily negligent if a reasonably prudent person would know that the history was false and misleading. When the physician or nurses are negligent in obtaining the history, the patient is contributorily negligent only if he knows the physician is unaware of a condition which imposes a risk of danger to the patient and his failure to inform the physician of the condition is unreasonable under the circumstances.

*Mackey, supra,* 587 S.W.2d at 255–56; *see also Skar v. City of Lincoln, Nebraska,* 599 F.2d 253, 260 (8th Cir.1979) (contributory negligence was a proper jury question when patient "gave materially false and misleading information"); *Fall, supra,* 449 N.E.2d at 628 (a contributory negligence instruction was appropriate when the patient failed to provide complete and accurate information to the doctor).

" 'To establish the defense of contributory negligence the burden is upon the defendant to prove by a preponderance of the evidence that the plaintiff was negligent and that such negligence contributed in some degree *as a proximate cause of the injury to the plaintiff.*' " *District of Columbia v. Sterling,* 578 A.2d 1163, 1165 (D.C.1990) (quoting *May v.*

*Washington, Virginia & Maryland Coach Co.,* 197 A.2d 267, 268 n. 1 (D.C.1964)). Failure to provide symptoms to a doctor does not constitute contributory negligence, rather it may result in no negligence on the part of the physician. *Mackey, supra,* 587 S.W.2d at 254 (*citing Johnson v. St. Paul Mercury Ins. Co.,* 219 So.2d 524, 528–29 (La.Ct.App.1969)); 36 A.L.R.3d 1349 (1969); *Amdur v. Zim Israel Navigation Co.,* 310 F.Supp. 1033, 1036 (S.D.N.Y.1969); *Tangora v. Matanky,* 231 Cal.App.2d 468, 42 Cal.Rptr. 348 (1964). Only if a patient's information or symptoms are false or misleading after being questioned, is a physician entitled to a contributory negligence instruction. *Mackey, supra,* 587 S.W.2d at 249 (patient gave false and misleading case history); *Skar, supra,* 599 F.2d at 253 (most of information provided to physician was untrue); *Fall, supra,* 449 N.E.2d at 628 (patient, when asked, told doctor he did not have chest pains when he did).

"Where, however, there is no evidence from which a reasonable juror could find that the plaintiff [was contributorily negligent], the question is one of law for the court." *Morrison, supra,* 407 A.2d at 568; *see also Bell v. Jones,* 523 A.2d 982, 996 (D.C.1986) (reversing holding of contributory negligence for lack of evidentiary support). It appears clear from a review of this record that the defendant did not provide the necessary evidence to establish a claim of contributory negligence during the 9:00 a.m. telephone call. Dr. Stock testified that he was not informed about any pains or other complaints besides gas during the conversation with the decedent's daughter. When questioned about whether he asked the daughter to describe the gas symptoms he responded negatively: "Since I heard nothing about pain or any other symptoms, I didn't ask for the description, no."

Thus Dr. Stock's testimony does not support a claim of contributory negligence; if it merits any consideration at all, it would be relevant to the issue of his own negligence. There is no assertion by the doctor that the decedent's daughter lied about the symptoms initially or upon further questioning by the

doctor.[6] Similarly the plaintiff's testimony does not support contributory negligence. Rather, there is simply a factual dispute regarding which symptoms were related to the doctor—a factual dispute to be resolved by the jury in determining whether the doctor's diagnosis constituted negligence or not.[7] Without supporting evidence the instruction as to contributory negligence constituted reversible error.

### III.

The misleading nature and confusion regarding the contributory negligence instruction is readily apparent on this record. The facts in this case were hotly disputed. Doctor Stock's testimony, if believed, might have established the absence of his own negligence. However, since the only negligence at issue was that his default at the time of the 9:00 a.m. phone call, the only contributory negligence a jury could consider was the patient's or her agent's actions during that time. There was no evidence of such contributory negligence. If the jury believed the story of the plaintiff's witnesses, a finding of negligence would have been reasonable. If the jury believed Dr. Stock's version of the telephone conversation, a finding of no negligence would have been reasonable. We do not know what the jury believed since neither party asked for a special verdict. Since the contributory negligence instruction was deficient in failing to explain the patient's standard of care, and to limit the jury's consideration of contributory negligence to the time of negligence, and since in any event

the record reveals no evidence of contributory negligence, this case should be reversed and the matter remanded for a new trial.

6. An example of a case where the medical staff was deceived is *Rochester v. Katalan*, 320 A.2d 704 (Del.1974). In *Rochester* the decedent had been taken to the emergency room for treatment. The decedent and his friend "claimed to be heroin addicts suffering withdrawal symptoms" and "requested medication for [his] discomfort." *Id.* at 706. The decedent's physical symptoms supported his claimed withdrawal—he was abusive and uncooperative, complained of stomach pains, moaned, his body was shaking and his eyes were glassy. The doctor administered a dose of methadone. When decedent's behavior became violent and he requested more methadone, a second dosage was provided. The patient died during the night of multiple drug intoxication. The decedent had never been a heroin addict and had failed to tell the hospital staff that he had consumed some beer and taken librium

pills. *Id.* at 706–07. The question presented to the court was whether the decedent contributed to his own death. The court assumed that the defendants were negligent. The court concluded that the decedent was contributorily negligent because he put on an act and lied to the hospital staff. *Id.* at 708.

7. Unlike Judge Farrell, I do not view Dr. Stock's version of events as establishing contributory negligence, but as establishing the absence of negligence. Mrs. Jones, an elderly woman recovering from surgery, could not depart from any objective standard of reasonable care when she did not lie about, but rather only provided some symptoms, and when Dr. Stock failed to ask any follow-up questions about the symptoms or observe any symptoms she was experiencing.