**OBELISK CORPORATION, Appellant,**

v.

**The RIGGS NATIONAL BANK OF WASHINGTON, D.C.,**
**Appellee.**

**No. 94–CV–1391.**

District of Columbia Court of Appeals.

Argued Oct. 26, 1995.

Decided Dec. 21, 1995.

---

Michael E. Friedlander, Washington, DC, for appellant.

Richard S. Hoffman, Washington, DC, for appellee.

Before FERREN and KING, Associate Judges, and MACK, Senior Judge.

FERREN, Associate Judge:

A jury awarded appellant, Obelisk Corporation, $100,000 plus interest and statutory costs in a breach of contract dispute with appellee, The Riggs National Bank. Liability is not at issue in this appeal, which is limited to Obelisk's claim, as prevailing party, that the trial court's allowance of damages was too low. Specifically, Obelisk appeals the trial court's rulings that: (1)

granted Riggs' motion for a partial directed verdict on Obelisk's claim for damages based on lost future earnings; (2) excluded certain evidence tending to prove Obelisk's lost future earnings; (3) gave a jury instruction on agreements to make future contracts; and (4) gave the jury an instruction on mitigation of damages. We find no error and therefore affirm.

## I.

On May 25, 1990, Obelisk Corporation, owned and operated by its founder, Basil Rahim, entered into a consulting contract to help The Riggs National Bank expand its financial advisory services by developing a Merchant Banking Group under the direction of Alton G. Keel, Jr., a former ambassador to NATO. Under the contract, Riggs was to pay Obelisk an annual base retainer fee, or draw, of $80,000. Obelisk's principal remuneration, however, was to be 50% of the fees Riggs "actually earned" on any jointly handled merchant banking business, less a maximum offset of 25% for Riggs' out-of-pocket expenses. Obelisk's commissions were to continue for a period of four years after execution of the contract, or four years after the last renewal, whichever came later. The contract provided that Riggs had "sole discretion" over the products and services offered to customers and that Riggs retained "absolute right" to refuse any business that Obelisk introduced to Riggs.

Riggs established its Merchant Banking Group and, with the personal assistance of Rahim, began to build the foundation for its financial advisory services. Riggs and Obelisk had scheduled the contract to terminate on December 31, 1991, but had provided for automatic one-year renewals in the absence of a notice of non-renewal. Before the first contract year expired, however, Obelisk and Riggs amended the contract on December 5, 1990, to expand the scope of their cooperation. The amended contract required Obelisk to become more involved in developing the products and services of Riggs' Merchant Banking Group, including the hiring and training of Riggs' in-house merchant banking staff. Rahim orally promised to devote more time to working at Riggs. Obelisk's annual base draw was increased to $140,000, and the contract was extended to December 31, 1992. Rahim received permission to use Riggs' letterhead and business cards and to designate himself a Riggs "Senior Advisor."

The relationship between Riggs and Obelisk soured in 1991, primarily because of a disagreement over Obelisk's commissions for transactions which Riggs had initiated without Obelisk's assistance, but on which Obelisk had worked. In May 1990, Rahim had proposed a 50% commission on two such transactions, but Riggs had rejected the suggestion. The parties therefore began negotiations in 1991 to amend the contract a second time. On November 25, 1991, Rahim and Keel signed a second amendment to the original contract (as amended). Under the terms of that second amendment, Obelisk would receive a $75,000 fee for all merchant banking transactions for which Riggs received revenues before 1992; Obelisk would earn certain percentage commissions on five specified merchant banking contracts expected to generate fees in 1992; and Obelisk would receive commissions to be negotiated case-by-case for all new accounts, but not to fall below 25% of Obelisk's 50% commission for "privatization" transactions under the original contract (i.e., a floor of 12½%).[1] All other terms of the original contract (including the first amendment) were incorporated by reference into the second amendment.

Little more than a month later, on December 31, 1991, Riggs orally terminated the consulting contract with Obelisk. Riggs proceeded to dismantle its Merchant Banking Group and did not pursue any merchant banking transactions under negotiation. On July 13, 1992, Obelisk filed suit against Riggs for breach of contract, claiming damages under the contract as amended both in December 1990 and in November 1991. Specifically, Obelisk claimed as damages (1) the $140,000 base consulting fee for 1992 specified in the first amendment; (2) the

1. A November 26, 1991, memorandum from Keel to Obelisk indicated that, for "banking management" transactions, Obelisk's specified percentage commission would not fall below 10% of the 50% commission for like transactions in the original contract, meaning a floor of 5%.

$25,000 remaining unpaid on the $75,000 commission agreed upon in the second amendment for the merchant banking revenues that Riggs received before 1992; (3) a $147,396 commission on revenues Riggs received on the five contracts specified in the second amendment; (4) a $157,904 commission on a transaction involving the Mongolian Peoples Republic; and (5) a $579,934 commission reflecting lost future earnings that Obelisk allegedly would have received on projected merchant banking revenues from business under negotiation at the time of Riggs' breach.

Except as to the unpaid $140,000 under the first contract amendment, Obelisk premised its claim at trial on Riggs' alleged breach of the second contract amendment, in particular on four provisions reflecting the different categories of damages specified above. According to Rahim's trial testimony, the second amendment reflected Obelisk's agreement to forgo claims against Riggs totaling $673,000 arising out of merchant banking transactions under the original contract, in return for Riggs' assurance that Obelisk would be able to work on, and receive fees from, all future transactions however originated. Riggs answered that the second amendment had never become contractually binding; rather, it was merely a proposal on which agreement had not been reached on two important issues: the formula for fee sharing, and Rahim's proposed "restructuring plan" for Riggs' merchant banking activities and officers.

Obelisk's case for liability was presented primarily through the testimony of Rahim, the cross-examination of several Riggs' employees responsible for negotiating the second amendment, and various documents relating to that amendment. To establish damages, including the $579,934 for lost future earnings, Obelisk relied upon the express terms of the first and second amendments, as well as on the testimony of Rahim. Rahim calculated lost future earnings by listing projected Riggs' retainer fees from 24 transactions under negotiation and then multiplying those fees by the percentage Obelisk estimated its commission would be for each. Because Obelisk and Riggs had never reached agreement on Obelisk's commissions for any of these transactions, however, Rahim used percentage commission floors that Obelisk and Riggs had negotiated for two particular types of merchant banking transactions, privatization and banking management services, see *supra* note 1, and then "conservative[ly]" estimated Obelisk's percentage commissions for the remaining transactions under negotiation. Obelisk's evidence also included future earnings projections prepared by Obelisk for Riggs before termination of the contract, as well as cross-examination of Riggs personnel and documentation that at least one transaction under negotiation in 1991 had been consummated.

At the completion of Obelisk's case, Riggs moved for a partial directed verdict on Obelisk's $579,934 claim for damages based on lost future earnings. The trial judge granted the motion on the ground that Obelisk's future damages were too speculative. As to the rest of Obelisk's claims derived from the first and second contract amendments, the jury returned a verdict for $100,000. At the conclusion of the trial, Riggs proposed a special verdict form that asked the jury specifically whether it found the second amendment to be an enforceable contract and, if not, whether it found Riggs had breached the original contract. Obelisk, however, opposed Riggs' proposal, the trial judge agreed with Obelisk, and the jury rendered a general verdict. The trial court entered judgment on September 23, 1994.

## II.

As a threshold response to Obelisk's claim for damages attributable to lost future earnings, based on the second contract amendment, Riggs contends that the jury's $100,000 verdict, in such low amount, reflects a finding that the parties never agreed to the second amendment. As a result, says Riggs, any claim to lost future earnings is automatically precluded. Riggs argues, in the alternative, that Obelisk's successful opposition to Riggs' request for a special verdict form estops Obelisk from contesting the partial directed verdict that rejected future lost earnings since one cannot be sure, in the

absence of a special verdict, that the jury based its verdict on the second amendment.

We do not believe the $100,000 verdict speaks with sufficient clarity to permit the conclusive inference that the jury did not find Riggs bound by the second amendment. The $100,000 award was no more obviously inconsistent with a finding of liability under the second amendment than under the first amendment, since that award does not correspond to a figure that could logically be calculated under either possibility.[2]

Riggs' contention based on its rejected request for a special verdict form fares no better. Riggs argues that Obelisk should be estopped from raising on appeal the issue of lost future earnings because Obelisk intentionally opposed use of a special verdict form that would have made clear whether the jury had based its $100,000 award on the original contract, as first amended, or on the second amendment. According to Riggs, if the award was based on a breach of the contract, without reference to the second amendment, then Obelisk would have no basis for appealing the partial directed verdict, which dealt with damages arising solely under the second amendment. Although we disapprove of tactical decisions to obfuscate jury findings in order to justify particular issues on appeal, we do not believe it would be appropriate to apply an estoppel rule in this case.

Riggs' argument is premised on an assumption that the special verdict form Riggs proffered would have made clear whether the jury found liability and damages under the second amendment. Riggs then argues that, because a special verdict form would have revealed the basis for the jury's verdict, Obelisk's refusal to accept a special verdict should estop Obelisk from relying in this appeal on the second amendment, which, for all we can tell, the jury rejected. *See Robinson v. Washington Internal Medicine Assoc., P.C.,* 647 A.2d 1140, 1144–45 (D.C.1994) (in medical malpractice action presenting claim of negligence and defense of contributory negligence, plaintiff-appellant estopped from claiming error as to contributory negligence because plaintiff failed to request special verdict form or interrogatories that would have revealed whether jury reached contributory negligence); *Nimetz v. Cappadona,* 596 A.2d 603, 608 (D.C.1991) (in medical malpractice action, defendant-appellant estopped from claiming error as to one of several theories of recovery, absent request for special verdict, because jury may have found for plaintiff on theory unaffected by trial court error).

Unlike *Robinson* and *Nimetz,* this case presents a single theory of liability and a single merits defense: Obelisk's alleged rights under a twice amended contract, and Riggs' denial that the second amendment had been accomplished. Obelisk does not argue, in the alternative, for $673,000 in damages

---

2. If the jury found that Riggs had breached only the contract as initially amended in December 1990, then Obelisk should have received an award of either $140,000, with no $100,000 offset attributable to mitigation, or $40,000, after the $100,000 alleged offset.

If the jury found that Riggs had breached the contract as amended a second time, then Obelisk's damages may have ranged as high as $470,-300 and as low as $163,000 (excluding Obelisk's claim for lost future earnings). The $470,300 figure includes the $140,000 consulting fee under the first amendment, $25,000 for income from existing transactions through December 1991, $147,396 for the net revenues received by Riggs in 1992 on five merchant banking transactions listed in the second amendment, and $157,904 on a transaction involving the Mongolian Peoples Republic. Obelisk would be entitled to $163,-000, however, if the jury credited Obelisk's claims for $140,000 and the $25,000; credited Riggs' contention that its expenses, deductible from Obelisk's $147,396 fee on the five transac-

tions specified in the second amendment, were not capped at 25% (leaving $98,000 in damages); credited Riggs' argument that Obelisk had a duty to mitigate damages for $100,000; and excluded Obelisk's damages for the Mongolian Peoples Republic transaction. Because the jury, therefore, could have found for Obelisk under the first contract amendment in the amount of $40,000 or $140,000, and for Obelisk on the second amendment in an amount as low as $163,000, we cannot say a $100,000 verdict conclusively reflects one theory or the other.

Riggs cites in its brief a single Maryland Court of Appeals decision, *Adams v. Manown,* 328 Md. 463, 615 A.2d 611 (1992), which is inapplicable here. In *Adams,* the court treated a $43,000 award as a finding for the appellee on the first count of the contract, and not on the second, because $43,000 was the precise amount of damages alleged under the first count. As indicated, we do not have that kind of precise situation here.

under the original contract—a claim Obelisk says it waived in consideration of Riggs' agreement to the second amendment. The most Riggs can be saying, therefore, is that a special verdict would have revealed whether the jury found liability (and $100,000 in damages) under the second amendment or, instead, under the first amendment of the contract.

We put aside Obelisk's argument that the amended agreement is an integrated, nonseverable contract. We are willing to assume, solely for the sake of argument, that Riggs is correct: a special verdict could have helped this court know whether the $100,000 in damages was attributable to the second amendment or not—a fact that would inform us at the outset whether Obelisk's contentions on appeal, based solely on validity of the second amendment, should be addressed. Even on this assumption, however, Riggs cannot persuasively argue for estoppel, because the special verdict form Riggs proffered would have confused the jury and thus not yielded the information Riggs says it would have revealed.

The jury faced a complicated analytical task that the special verdict form did not reflect. Under the circumstances, the first two questions on that form—"Do you find that ... 'Amendment # 2' is an enforceable contract between Obelisk ... and Riggs," and, if so, "do you find that the contract was breached by Riggs?"—are ambiguous. As Riggs' own contentions and the trial judge's instructions make clear, the jury faced a threshold question whether the entire second amendment was an unenforceable "agreement to agree." Then there was a possible next question: if the second amendment was not altogether unenforceable, were some terms enforceable and others not? That is to say, there was a severability issue if the jury found the second amendment was not a nullity. Riggs' proffered special verdict questions, however, did not reflect possible severability. Some jurors, therefore, could have understood the question whether " 'Amendment # 2' is an enforceable contract" to mean enforceable in full, whereas other jurors might have read it to mean enforceable in part; the question did not assuredly track the bifurcated analysis required by the judge's instructions. At the very least, the special verdict question should have read: "Do you find that ... 'Amendment # 2' is an enforceable contract *in any respect* between Obelisk ... and Riggs?" (italicized words added). This failure to be specific enough could have caused jury confusion sufficient to erase any possible benefit from the special verdict form. Accordingly, we find no basis for estoppel in Obelisk's refusal to agree to Riggs' faulty special verdict form; the questions, as presented, oversimplified—and thus might have misdirected—the jury's inquiry.

### III.

Turning to Obelisk's first claim of error, we conclude that the trial judge did not err in granting Riggs' motion for a partial directed verdict on Obelisk's claim for damages attributable to loss of future earnings. Our reasoning, however, differs in some respects from the trial judge's analysis.

Riggs predicated its directed verdict motion on three independent grounds: (1) the unambiguous language of the written contract, even as amended the second time; (2) the speculative nature of the claim for future damages; and (3) the lack of agreement on a compensation formula for future transactions, other than for "privatization" transactions and for "banking management services." The trial court ruled in Riggs' favor on the second ground, excluding Obelisk's claim because "the jury would have to speculate about or guess as to the damages."

In reviewing the entry of a directed verdict, we must view the evidence in the light most favorable to the non-moving party (here, Obelisk) and give that party the benefit of all reasonable inferences from the evidence. *See Consumers United Ins. v. Smith,* 644 A.2d 1328, 1339 (D.C.1994); *District of Columbia v. Evans,* 644 A.2d 1008, 1019 (D.C.1994). We are not, however, limited to reviewing the legal adequacy of the grounds the trial court relied on for its ruling; if there is an alternative basis that dictates the same result, a correct judgment must be affirmed on appeal. *See Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C.1982); *see also Sterling Mirror v. Gordon,* 619 A.2d 64, 67 n.

5 (D.C.1993). Here, the trial court did not err in reaching the result it did, although we reach the same result on a different ground. We sustain the partial directed verdict here because the Riggs–Obelisk contract, even if modified by the second amendment, precluded Obelisk from claiming damages for lost future earnings.

■ The construction of a written agreement is a question of law when its provisions are unambiguous, and thus in that instance the court, not the jury, interprets it. *See Spellman v. American Sec. Bank*, 504 A.2d 1119, 1127 (D.C.1986); *Howard Univ. v. Best*, 484 A.2d 958 (D.C.1984). Even if we assume the Riggs–Obelisk contract was amended a second time in November 1991, as Obelisk attempted to prove at trial, that amended contract unambiguously gave Riggs unfettered authority to decide the merchant banking products and services it would offer, the transactions in which it would engage, and the customers with whom it would conduct business. The original contract between Riggs and Obelisk provided:

> (B)(1) Obelisk shall seek new clients for such products and services which Riggs, in its *sole discretion*, elects to offer its customers from *time to time* . . .
>
> (3) Riggs retains *the absolute right* to refuse any business or to conduct business with any person or entity introduced to Riggs by Obelisk. Riggs retains *final say* over which products and services shall be offered to clients, and *which clients are acceptable* to Riggs. (Emphasis added.)

The contract also provided that Obelisk's fees would be calculated on the basis of net revenues "actually received" by Riggs.

■ When language of a contract is clear and unambiguous on its face, we will assume that the meaning ordinarily ascribed to those words reflects the parties' intentions. *See Lucas v. U.S. Army Corps of Eng'rs*, 789 F.Supp. 14, 16 (D.D.C.1992). Here, the contract language unambiguously says that Riggs retained "sole discretion" to determine

from "time to time" the products and services it would offer, the "absolute right" to refuse to conduct any business introduced by Obelisk, and "final say" over "which products and services" are offered and "which clients are acceptable."[3] Rather than altering these contractual terms, the second amendment incorporated them by reference by expressly providing: "All other terms and conditions of the Agreement dated 5.25.90 shall remain unchanged."

Obelisk contends that Riggs already had "exercise[d] [its] discretion over the products and services" involved in the 24 transactions under negotiation, and that, as to Obelisk's rights to remuneration, the contract did not permit Riggs to walk away from these transactions. In other words, Obelisk argues that whatever discretion Riggs retained under the contract, as amended, to reject potential business, however initiated, that right did not apply to 24 potential deals that the parties had identified and thereby exempted from Riggs' unilateral right of rejection; for purposes of the parties' agreement, Riggs had exercised its "sole discretion" in favor of pursuing the 24 potential transactions until completion.

The record indicates, however, that few of the transactions had progressed beyond the earliest stages of negotiation. No agreements had been reached, and no retainer fees had been paid. Nor had Riggs and Obelisk agreed upon Obelisk's compensation for any transaction. Rahim acknowledged on cross-examination that the majority of the transactions had either no chance, or very little chance, of coming to fruition. In fact, Obelisk acknowledges that only one of the possibilities, the Biokat transaction, was in an advanced stage of negotiation (with a draft agreement). And Obelisk does not dispute that Riggs ultimately rejected the Biokat deal on the advice of outside legal counsel. Obelisk's argument, therefore, is difficult to reconcile with plain language that clearly allowed Riggs to have "sole discretion" and

---

**3.** The trial judge also found the contract unambiguous. In granting Riggs' motion to exclude oral testimony on the meaning of these contractual provisions under the parol evidence rule, the judge said that the contract "clearly indicates an acknowledgement . . . that Riggs is not obliged to continue on any path when it comes to the development of any service or any aspect of merchant banking."

"final say" over "which products and services shall be offered" and "which clients are acceptable to Riggs."[4]

Solely for the sake of argument, however, we shall assume that, by approving negotiations on the 24 potential transactions Obelisk has identified, Riggs had incurred a good faith obligation to Obelisk under the contract to pursue and complete those transactions, in the absence of a commercially valid reason not to do so. Even on this assumption, however, Obelisk cannot prevail. As to the one transaction, Biokat, that appeared headed for completion, outside legal counsel warned against it—a sound commercial basis for ending the matter. As to the other 23, even if Riggs had a contractual duty to Obelisk to pursue them further, Obelisk's damages—as the trial judge concluded—would be too speculative to permit recovery.

■ Although it is not necessary to prove damages to a "mathematical certainty," we do require that a plaintiff provide "some reasonable basis on which to estimate damages." *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C.1991) (citation and internal quotation marks omitted). We have affirmed directed verdicts where the plaintiff has failed to produce evidence that would allow the jury to make an award based on anything but "speculation." *Id.* at 1144; *see Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 205–06 (D.C.1986). Not counting Biokat, Obelisk's evidence of future damages is entirely conjectural; it would require a jury to engage in a multitude of assumptions for which no evidence is available.

Although Rahim, on behalf of Obelisk, introduced calculations based entirely on the 24 transactions under negotiation, he placed greater reliance during cross-examination on the mere fact that a "pipeline" of transactions had been created. Rahim testified that "the important thing was ... not which particular project we are going through whether it was this one or that one, but that the business could generate so much revenue during 1992." He was unable, however, to establish any other opportunity open to Riggs. Moreover, all 24 transactions required Rahim to guess as to how third-parties would behave in future dealings with Riggs, increasing the speculative quality of Obelisk's calculations. *See Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (assumptions regarding third party behavior undermines certainty of projected lost income).

Basically, therefore, Rahim asked the trial judge to conclude that, based on a specified number of transactions that were in various stages of negotiation, there was a sufficient likelihood that enough of them would pan out that a jury reasonably could estimate the business earnings that Riggs—and thus Obelisk—was likely to achieve. There is, however, an insurmountable problem here (in addition to the fact, which the trial judge noted, that Obelisk proffered no expert testimony to inject at least some disinterested objectivity into its presentation).[5] Even if Obelisk could demonstrate that a particular percentage of the 24 negotiations would be likely to lead to firm contracts, and also could prove to a reasonable certainty what the contract amounts were likely to be—both

**4.** Obelisk also contends that promissory estoppel, or at least a duty of good faith and fair dealing, prevents Riggs from invoking against Obelisk Riggs' right to terminate the transactions under negotiation. Neither estoppel nor the duty to proceed in good faith, however, prohibits a party from relying upon rights expressly reserved in a contract. *See, e.g., Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552–53 (D.C.1994); *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 787 (D.C.1968). Obelisk attempts to reinforce its argument, however, by contending that, while negotiating the second amendment, Obelisk received the right to work jointly with Riggs on all merchant banking transactions and, therefore, inferentially received the right to a say in what deals should be pursued. But even if

Obelisk had received this right, such joint participation could not have given Obelisk a veto. That right unquestionably belonged to Riggs, which expressly retained the unilateral right to reject potential contracts.

**5.** We do not address the question whether the subject matter at issue was "beyond the ken of the average lay [person]" requiring expert evidence as a matter of law, *see Columbus Properties v. O'Connell*, 644 A.2d 444, 447 (D.C.1994), or whether Rahim was qualified as an expert in merchant banking business. We do agree with the trial judge, however, that the testimony of an independent expert might have made Obelisk's lost future earnings claim less speculative.

dubious propositions—there was still little if any basis for the jury to decide what Obelisk's compensation from these transactions would be.

■ Obelisk presented its lost earnings for each of the 24 transactions through the testimony of Rahim. Under the second amendment, however, Obelisk's commissions were to be determined on a case-by-case basis. In order to deal with the lack of a compensation term, Rahim had to speculate as to the commission fee that Obelisk and Riggs would agree upon in the future for the transactions. Contracts that lack material terms are too uncertain to enforce. *See Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1239–40 (D.C.1995). Thus, future losses calculated by assuming agreement on one of the most central terms of a contract, a party's compensation, when no such agreement exists, casts substantial doubt upon a figure proffered from that computation. Riggs and Obelisk did provide a compensation floor for two types of transactions, "privatization" and "banking management services,"[6] but for most of the transactions under negotiation—comprised of those the parties characterized as "funds sponsorship," "transaction engineering," "sovereign consulting," and "corporate finance" transactions—there was not an agreed upon compensation floor.

In light of all the foregoing, we apply the following principle to preclude Obelisk's

6. Even as to the two types of transactions with a compensation floor, however, Rahim admitted that one potential client on a privatization project had rejected the Riggs proposal and that none of the banking management services transactions was "reasonably certain."

7. We summarily reject Obelisk's contention that the trial judge erred in refusing to admit in evidence, as inadmissible hearsay, a memorandum written by Rachad Itani, a Riggs employee. At trial, Obelisk offered the memorandum, which set forth Itani's analysis of the viability and projected income stream for categories of the transactions under active negotiation, as an admission of a party opponent, in order to establish lost future earnings. *See Pratt v. District of Columbia*, 407 A.2d 612, 616 (D.C.1979); *Chaabi v. United States*, 544 A.2d 1247, 1248 (D.C.1988); FED.R.EVID. 801(d)(2). As the proponent of the evidence, Obelisk had the burden of showing that the memo concerned a matter within the scope

claim for lost future earnings: "damages for the loss of anticipatory profits, which the plaintiff might have made but which are not reasonably certain and are not susceptible of proof, cannot be recovered." 11 WILLISTON ON CONTRACTS § 1345, at 239 (1995 Supp.); 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1020 (1994 Supp.).[7]

## IV.

■ Obelisk contends that the agreement-to-agree instruction to the jury not only was unnecessary in light of the directed verdict as to lost future earnings, but also was needlessly confusing and prejudicial. To the contrary, the trial judge did not err in instructing the jury about "agreements to agree in the future."

At the conclusion of trial, the judge told the jury that

agreements to agree in the future about the terms of the contract are not enforceable because no way exists to determine what the terms, not yet agreed to, will be or even if there will be agreement to terms at all. Consequently, if you find that the plaintiff, Obelisk, and defendant, Riggs, agreed to decide all material terms of amendment [two] ... you are instructed that Obelisk has not carried its burden of proof of the existence of an enforceable agreement as to those ... terms to be agreed upon in the future and you must find for the defendant in that respect.[8]

of Itani's agency. *See In re M.L.H.*, 399 A.2d 556, 558 (D.C.1979); 4 JACK B. WEINSTEIN, WEINSTEIN'S EVIDENCE ¶ 801(d)(2)(C)[01] (1995). Obelisk failed to do so, relying solely on the outward appearance of the document. The Riggs employee who received the memo, however, later testified upon cross-examination that Itani had written it in an effort to "save his job" after learning that he was to be let go upon termination of Riggs' Merchant Banking Group. The decision to exclude the memo, therefore, was within the broad discretion normally afforded to the evidentiary rulings of trial courts. *See, e.g., Carey Canada, Inc. v. Columbia Casualty Co.*, 291 U.S.App. D.C. 284, 295, 940 F.2d 1548, 1559 (1991) (employing abuse of discretion standard); *Watts v. Smith*, 226 A.2d 160, 163 (D.C.1967) (employing clearly erroneous standard).

8. *See First Nat'l Bank of Maryland v. Burton, Parsons & Co.*, 57 Md.App. 437, 470 A.2d 822, 828–829 *cert. denied*, 300 Md. 88, 475 A.2d 1200

This jury instruction, provided as part of the general instructions regarding contract formation and interpretation, was highly relevant in the context of the case. Obelisk based Riggs' contractual liability primarily upon the second amendment, which Riggs opposed on the ground that the amendment was merely an interim understanding that had never become contractually binding. Riggs also contended that the second amendment was not binding because certain "critical features" of the amendment required future agreement, namely the amount of fee sharing on transactions under negotiation and a proposed plan for restructuring Riggs' merchant banking operation, which Rahim had attached to the second amendment. The instruction, therefore, was relevant to the jury's consideration of whether the second amendment had become effective, in whole or in part.

Nor did the instruction necessarily confuse the jury or otherwise prejudice Obelisk on the issue of damages. Obelisk contends that the instruction confused the jury about the amount of damages awardable for income to be received in the future on the five transactions specifically listed in the second amendment. We cannot agree. The trial judge instructed the jury as to "agreements-to-agree" during a portion of the instructions that preceded, and were altogether separate from, the instructions on damages. Any possible confusion caused by the "agreement-to-agree" instruction would have been dispelled once the trial judge, through the partially directed verdict, brought out the fact that lost future earnings no longer were part of Obelisk's case and thus no longer should be considered as part of Obelisk's damages exhibit.

## V.

■ Obelisk maintains, finally, that the trial court erred in giving a mitigation instruction—permitting the jury to reduce damages by the $100,000 that Rahim received in 1992 from consulting for the Carlisle Group—because Obelisk, under the circumstances, had no duty to mitigate damages. We find no error. The trial court instructed the jury that:

> Now, ladies and gentlemen, I want to give you a instruction concerning the mitigation or the lessening of damages. You are instructed that anyone who claims damages as a result of an alleged breach of contract has a duty under the law to mitigate those damages, that is, a duty to take advantage of any reasonable opportunity under the circumstances to reduce or lessen or minimize the loss of the damages.

> Now if you find ... that a party should have taken advantage of a business opportunity which was reasonably available to a party under all of the circumstances shown by the evidence, then you should reduce the amount of that party's damages by the amount that the party would have received if it had taken advantage of such opportunity. However, the burden of proving that the damage—that damage could have been avoided or mitigated rests with the party that committed the breach.[9]

Although generally there is no duty to mitigate damages when the contract does not require the personal services of a contracting party, see, e.g., *Grinnell Co. v. Voorhees*, 1 F.2d 693, 695 (3d Cir.), *cert. denied*, 266 U.S. 629, 45 S.Ct. 195, 69 L.Ed. 477 (1924), the trial judge appropriately decided to apply the mitigation rule in this case. There was considerable evidence that Obelisk's activities consisted almost entirely of Rahim's consulting services and that, but for Riggs' alleged breach of its contract with Obelisk, Rahim would not—and under the contract could not—have undertaken merchant banking

(1984) (refusing to provide damages under a royalty contract because compensation terms subject to future agreement too vague and indefinite); *Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497 501–02 (8th Cir.1988) (treating provision of dealership agreement requiring manufacturer to negotiate with dealer after termination of agreement too vague and indefinite to enforce); RESTATEMENT (SECOND) OF CONTRACTS § 33(2)

(1979) (the terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy).

**9.** *See Edward M. Crough v. Dept. of Gen. Sev.*, 572 A.2d 457, 466–67 (D.C.1990) (discussing duty to mitigate).

projects for the Carlisle Group that Riggs had been pursuing.

Obelisk argues that the consulting contract was at all times between Riggs and Obelisk, not between Riggs and Rahim, and thus that Rahim's own earnings after Riggs' breach were irrelevant to any duty Obelisk might have to mitigate. For all practical purposes, however, Rahim's and Obelisk's consulting services were indistinguishable. Rahim was Obelisk's founder, president, and only employee throughout Obelisk's corporate existence. Rahim and his wife wholly owned Obelisk. Riggs employees regarded Rahim and Obelisk as alter egos, and there is no indication that Obelisk provided services to other clients during the period that Rahim was working sixty to eighty hours each week at Riggs.

The record also shows that, but for Riggs' termination of the contract with Obelisk, Rahim would not have been able to engage in any of the merchant banking projects under the contract he later pursued with the Carlisle Group. In issuing the mitigation instruction, the trial judge expressly relied (in the judge's words) upon evidence that "Rahim's doing for Carlisle pretty much what he's doing for Riggs." Gains by an injured party in other transactions made possible by a defendant's breach may be used to mitigate damages. *See* 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1041, at 256 (1964); *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 270 A.2d 645, 651 (1970). While the contract with Riggs was still in effect, Rahim would have been precluded from completing the transactions for the Carlisle Group that generated $100,000. The mitigation instruction was accordingly proper.

*Affirmed.*